

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

EAG:EMN
F.#2008R00670

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 6, 2011

By ECF and Hand Delivery

The Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:  United States v. Volkan Mergen
           Criminal Docket No. 06-352 (S-2) (NGG)

Dear Judge Garaufis:

      The government respectfully submits this letter in connection with the defendant Volkan Mergen's sentencing, which is scheduled for July 8, 2011 at 11:00 a.m. For the reasons set forth below, the government respectfully submits that the defendant should be sentenced to a term of imprisonment substantially in excess of the mandatory minimum sentence of five years that he faces.

## Background

      On June 5, 2006, the defendant waived indictment and pled guilty before the Honorable Kiyo A. Matsumoto, who was then a United States Magistrate Judge, pursuant to a cooperation agreement, to a one-count information charging him with interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952(a)(3)(A). Specifically, the information charged the defendant with traveling from New York to New Jersey and back on January 27, 2006 in furtherance of a plan to set fire to a residence on Hamden Avenue in Staten Island.

      The government subsequently learned that the defendant withheld material information concerning his past criminal conduct and lied when confronted about it, and thereafter informed counsel that the defendant had breached the cooperation agreement. After negotiations to resolve the breach through a plea to an additional charge proved unsuccessful, the government informed the defendant that it wished to proceed to sentence and would not make a motion pursuant to Section 5K1.1 of the United

States Sentencing Guidelines ("Guidelines") on his behalf. The defendant later moved to withdraw his guilty plea and, on August 5, 2008, the Court granted the defendant's motion without objection from the government. (Docket Entry No. 9).

On April 7, 2010, the defendant was charged in a second superseding indictment (the "superseding indictment") with six crimes. Count One charged the defendant with interstate travel in aid of racketeering relating to the Hamden Avenue arson. Counts Two and Three charged the defendant with conspiracy to possess with intent to distribute, and the distribution of, cocaine and marijuana from 2002 to 2004, in violation of 21 U.S.C. §§ 841 and 846. Counts Four and Five charged the defendant with robbery conspiracy and attempted robbery, in violation of 18 U.S.C. § 1951(a), in connection with an attempted robbery at gun-point in Staten Island on or about September 13, 2002. Count Six charged the defendant with using, carrying and possessing a firearm during, in relation to and in furtherance of the crimes charged in Counts Four and Five, in violation of 18 U.S.C. § 924(c).

On April 22, 2010, after a six-day trial, the jury found the defendant guilty of all six counts charged in the superseding indictment. The defendant subsequently made post-trial motions, which the Court denied by order dated August 25, 2010. (Docket Entry No. 106).

According to the Pre-Sentence Investigation Report ("PSR") prepared by the Probation Department, the defendant should be sentenced as a career offender pursuant to U.S.S.G. § 4B1.1 and, as such, faces a Guidelines range of imprisonment of 360 months to life. (PSR ¶¶ 54, 113). With respect to the Section 924(c) count, the defendant faces a statutory minimum sentence of five years' imprisonment that must run consecutively to any sentence imposed on the other five counts. (PSR ¶ 111).

Discussion

In his sentencing submission, filed with the Court under seal on June 27, 2011, the defendant asks the Court to sentence him to a non-Guidelines sentence and specifically urges the Court to impose a sentence of five years and one day in prison. The defendant addresses the sentencing factors set forth in 18 U.S.C. § 3553(a) in arguing in favor of a non-Guidelines sentence, and also sets forth a number of objections to the

3

Guidelines calculation set forth in the PSR.[1] In support of his application for a non-Guidelines sentence, the defendant cites, among other factors, his past cooperation, the age of his crimes and his family circumstances.

For the reasons set forth below, the government respectfully submits that the Probation Department correctly calculated the Guidelines range of imprisonment to be 360 months to life. Notwithstanding that, given the unique circumstances of this case, the government concurs with the defendant that consideration of all the Section 3553(a) factors supports the imposition of a non-Guidelines sentence, albeit one substantially in excess of the sentence requested by the defendant.

A.   The Defendant's Assistance to the Government

As defense counsel correctly notes in his submission, the defendant did cooperate and provide assistance to the government over a period of many years. While the defendant's criminal conduct during the same period ultimately resulted in the defendant's breach of his cooperation agreement and conviction at trial, there is no question that the defendant did also provide assistance to the government. The government agrees that the Court should consider this assistance in assessing the nature and circumstances of the defendant's offenses and his history and characteristics. See 18 U.S.C. § 3553(a)(1).

   1.   Initial Period of Cooperation

As established at trial, the defendant began acting as a confidential informant for the Federal Bureau of Investigation ("FBI") in approximately May 2001. As an informant, the defendant provided information to the FBI about criminal activity, primarily by the members and associates of the Gambino

---

[1]   In a Second Addendum to the PSR, dated June 30, 2011, the Probation Department responded to the defendant's objections. The government concurs with the Probation Department's response to the objections relating to paragraphs 23, 24 and 36 of the PSR. The government responds to the defendant's objections relating to paragraphs 40 and 42 in footnote three below. With respect to the defendant's objection to the Probation Department's finding that the defendant should be sentenced as a career offender, the government believes application of U.S.S.G. § 4B1.1 is appropriate as a Guidelines matter in light of the seriousness of the defendant's prior violent felonies and the instant crimes of conviction, among other reasons.

4

organized crime family of La Cosa Nostra ("Gambino crime family"), with which the defendant was associated.

In approximately May 2002, the defendant agreed that he would testify if called upon to do so, and made a handful of consensual recordings of conversations with members and associates of the Gambino crime family. Otherwise, for the next two-and-a-half years, the defendant's cooperation primarily consisted of providing information about the criminal activities of others and engaging in certain activities at the direction of the FBI, such as making loanshark payments.

2. Crimes Involving Maggio's Crew

In January 2005, a few months after the defendant began associating with a Staten Island-based crew of the Bonanno organized crime family of La Cosa Nostra ("Bonanno crime family"), the defendant again began making consensual recordings at the direction of the FBI. The leader of the crew was Bonanno crime family associate Michael Maggio, who reported to Gino Galestro, a soldier. The associates in Maggio's crew included, among others, Stefan Cicale, Jose Garcia, John Tufarelli and Joseph Young.

During the following year, the defendant made approximately 275 consensual recordings, capturing evidence of numerous crimes committed by Maggio and the members of his crew. To further the FBI's investigation, the defendant was authorized during this period to engage in specific types of otherwise illegal activity, such as purchasing drugs and guns at the express direction of the FBI. For example, beginning in November 2005, the defendant negotiated the purchase of cocaine from Garcia. The following month, the defendant purchased a quarter-kilogram of cocaine from Garcia and two unindicted co-conspirators. In addition, in August and November 2005, Young purchased three guns by providing false information to a dealer, and then sold those guns to the defendant after removing the serial numbers. Garcia and Young were ultimately convicted of these crimes and others as detailed below.

As further established at trial in the above-captioned case, and set forth in more detail below, the defendant's proactive cooperation was terminated shortly after the Hamden Avenue arson. In the months that followed, the FBI arrested several members of the Bonanno crime family crew the defendant had been secretly recording, including Maggio and Tufarelli, both of whom began cooperating with the government after learning, among other things, that the defendant had consensually recorded

5

scores of their conversations. Thereafter, Cicale and Garcia were also arrested and also decided to cooperate - a result further attributable, in part, to the defendant's cooperation. The cooperation of Maggio, Tufarelli, Cicale and Garcia led to further arrests and prosecutions in this district of several individuals for a multitude of crimes, including Genovese crime family captain Anthony Antico (racketeering and illegal gambling), Bonanno crime family associate Daryl Rosenblatt (robbery and weapons offenses) and Thomas Carbone (robbery and weapons offenses).

One of the last recordings made by the defendant at the direction of the FBI - of a conversation he had on January 26, 2006 with Young, hours before the arson, regarding the then-unknown details of the murder of Bonanno crime family associate Robert McKelvey in March 2005 - was particularly significant. The recording contributed to the decisions of Cicale, Garcia and Maggio to cooperate and plead guilty to charges related to their roles in the murder. The recording also contributed substantially to the successful prosecutions of Young and Galestro for their roles in the murder.

In October 2008, Young was tried before the Honorable Allyne R. Ross for McKelvey's murder and a host of other crimes, including the Hamden Avenue arson and weapons offenses. In addition to the testimony of Cicale, Garcia and Tufarelli, among other evidence, the government introduced at trial Young's recorded confession to the defendant in which Young recounted having killed someone on Maggio's orders and disposed of the body to the point that "[w]hen I was done . . . , [p]owder, was all that was left." On October 27, 2008, Young was convicted of 24 of 26 counts, including the McKelvey murder, and, on March 13, 2009, was sentenced by Judge Ross to life imprisonment.

This recording, in addition to other evidence, also led to the successful resolution by plea of racketeering and murder conspiracy charges against Galestro, who ordered the murder of McKelvey. For his crimes, Galestro was sentenced by Judge Ross on September 8, 2009 to 20 years' imprisonment.

In addition to the successful prosecutions discussed above, based in substantial part on the recordings made by the defendant at the direction of the FBI, the government obtained convictions by plea of two other Bonanno crime family associates - one relating to the robbery at gun-point of a truck driver in Brooklyn, and the other relating to an extortion at gun-point of a man in a restaurant on Long Island. Both of those defendants pleaded guilty. It is reasonable to assume their plea decisions

were attributable in part to the existence of the recordings made by the defendant.

\* \* \* \*

Throughout the period in which he was cooperating with the FBI, the defendant also provided intelligence in other investigations of members and associates of La Cosa Nostra. During debriefings over the course of many years, the defendant identified the names and ranks of dozens of organized crime members and associates, including members and associates in each of the five New York City-based organized crime families. The defendant also provided information implicating many of the same individuals, and others, in crimes ranging from murder to narcotics trafficking, home invasion robberies, extortions, loansharking and illegal gambling. In sum, while the defendant's own criminal conduct precluded him from ever testifying as a cooperating witness, the information the defendant provided, and the consensual recordings he made, assisted the government.

B. The Defendant's Criminal Activities

The evidence adduced at the defendant's trial also overwhelmingly established that, time and again, in charged and uncharged conduct, the defendant participated without authorization from the FBI in criminal activities involving many of the same people and the same crimes he was bringing to the attention of the FBI. That the defendant's crimes are all very serious warrants a substantial sentence; that they were all done while the defendant was cooperating with the government is an aggravating factor that warrants even harsher punishment.

1. Background

FBI Special Agent George Wright, the first agent to have contact with the defendant, testified that from May 2001 to January 2005, the defendant was repeatedly advised, and several times acknowledged in writing, that he had not been authorized to engage in any criminal activity and that he could be prosecuted for engaging in any unauthorized criminal activity. Special Agent Wright testified that at no time did the defendant inform him that he had in fact been engaging in a variety of criminal activities, including activities with some of the individuals about whom the defendant was providing information to the FBI. FBI Special Agent Anthony Zampogna, who had contact with the defendant while he was recording Maggio's crew from January 2005 to January 2006, testified that, during this time, while the FBI authorized the defendant to engage in specific types of otherwise

illegal activity under close supervision, the FBI never authorized the defendant to participate in any acts of violence or any other illegal conduct as to which he did not receive specific authorization, which testimony was again corroborated by documentary evidence.

2. <u>Narcotics Charges</u>

The jury found the defendant guilty of Counts Two and Three, which charged the defendant with conspiracy to possess with intent to distribute, and the distribution of, cocaine and marijuana from 2002 to 2004.

Starting in approximately early 2002, the defendant and John Tufarelli began dealing marijuana in Staten Island. Tufarelli testified about how the business began, how he and the defendant had their own sources of supply and how they would divide up marijuana they purchased before giving it to street-level dealers to sell. Tufarelli testified that after paying back their sources, he and the defendant would evenly split the profits. Within a year after they began selling marijuana, at Tufarelli's suggestion, Tufarelli and the defendant began selling cocaine together. The operation worked similarly to the marijuana operation and used the same street-level dealers. Tufarelli estimated that he and the defendant were partners in the cocaine business for approximately six to twelve months, after which Tufarelli began to purchase cocaine directly from the defendant that Tufarelli would in turn sell himself. Tufarelli continued to purchase cocaine from the defendant until approximately late 2004.

Tufarelli's testimony was corroborated by the testimony of Daryl Rosenblatt, a criminal associate of the defendant and Tufarelli, as well that of Special Agent Wright. Special Agent Wright testified that on multiple occasions in 2002, 2003 and 2004 the defendant provided information to him about a number of individuals who were involved in narcotics-related activities. Tufarelli testified that he and the defendant were involved in narcotics activities with at least four of those individuals. The level of mutually corroborating detail provided by Tufarelli and Special Agent Wright was strong evidence that, over a number of years, the defendant provided information to the FBI about

8

many of the same people with whom he was involved in narcotics trafficking.[2]

### 3. Robbery and Firearms Charges

The jury found the defendant guilty of Counts Four through Six, which charged the defendant with robbery conspiracy and attempted robbery, as well as with violating 18 U.S.C. § 924(c) in connection with those crimes.

Tufarelli testified that while he and the defendant were in the narcotics business together, the defendant told him that a friend named Kurt gave the defendant a tip about an individual who regularly cashed checks from his BMW SUV at a Sunoco gas station on South Avenue in Staten Island. The defendant told Tufarelli that the check casher would typically have between $30,000 to $40,000 with him. The defendant's role was to act as a getaway driver and to provide a gun, while Tufarelli's role was to be a getaway driver and to recruit others to commit the actual robbery. Tufarelli recruited three other people to participate in the robbery, including Rosenblatt and brothers named Thomas and Randall Carbone.

On the day of the robbery attempt, the defendant, Tufarelli, Rosenblatt and the Carbone brothers met at Tufarelli's house. The defendant supplied the revolver that was given to the Carbones for use in the robbery. The conspirators stole two cars to be used in the robbery and then went to the area around the Sunoco station. While Tufarelli and the defendant waited in their cars, the Carbones waited in one of the stolen cars on the street in front of the gas station, while Rosenblatt waited nearby in the other stolen car. After the intended victim arrived and the robbers began to approach his car, the intended victim appeared to realize what was happening and drove away.[3]

---

[2] Additional details of the evidence of the narcotics charges are included in the government's opposition to the defendant's post-trial motions. (Docket Entry No. 104 at 3-4).

[3] The defendant objects to the Probation Department's finding of an intended loss of over $10,000 (see PSR ¶ 40) and application of a four-level adjustment for aggravating role (see PSR ¶ 42). (Def. Mem. at 3). With respect to intended loss, the evidence at trial amply supports the Probation Department's finding. For example, as noted supra, Tufarelli testified that the defendant told him that the check casher would typically have between $30,000 to $40,000 with him. (Trial Tr. 510-11).

Once again, Tufarelli's testimony was substantially corroborated by that of Rosenblatt, a conspirator who testified to his own involvement in the robbery attempt, and Special Agent Wright, the agent with whom the defendant had contact during the relevant time period. Specifically, Special Agent Wright testified that on August 30, 2002, the defendant told him that a Gambino crime family associate named Kurt Ricci wanted an individual who operated a check-cashing business from his vehicle to be robbed. The defendant told Special Agent Wright that the individual cashed checks in a parking lot on South Avenue in Staten Island and that the intended victim, who drove a black BMW SUV with a particular Connecticut license plate, would have approximately $40,000 with him. The evidence at trial established that on September 13, 2002, two weeks after the defendant informed the FBI about the potential robbery, the defendant himself led a group of conspirators in an attempt to commit the very same crime.[4]

4. <u>Interstate Travel in Aid of Racketeering</u>

The jury found the defendant guilty of Count One, which charged the defendant with interstate travel in aid of racketeering relating to the arson of a residence on Hamden Avenue in Staten Island on January 26 and 27, 2006. The evidence of the defendant's criminal involvement in the arson was overwhelming, in large part because the commission of the arson and the events leading up to it were all recorded on a tape the defendant himself made.

---

Moreover, the defendant told Special Agent Wright that the check casher would have approximately $40,000 with him. (Trial Tr. 894-96). With respect to role, the evidence at trial established that the defendant played a leadership role in the offense, which involved six participants (including the defendant), and thus the aggravating role adjustment is appropriate.

[4] The parties stipulated that during the relevant time period, the particular Connecticut license plate was registered to a woman with a black BMW X-5 automobile residing at a Greenwich, Connecticut address. Another cooperating witness, Charles Doherty, testified that he knew the same woman and her husband, Joseph Castello, who cashed millions of dollars in checks from his vehicle for customers, including Doherty, at various locations, including Staten Island, from 1996 through 2003. Additional details of the supporting evidence are included in the government's opposition to the defendant's post-trial motions. (Docket Entry No. 104 at 5-7).

Special Agent Zampogna testified that in the late afternoon of January 24, 2006, the defendant informed him that members of Maggio's crew were planning to commit an arson of a house located on Hamden Avenue in Staten Island later that night. The agent informed the defendant that he was not authorized to participate in the arson and that the FBI would do whatever was necessary to try to stop the arson from happening, including ending the defendant's proactive cooperation. Special Agent Zampogna testified that the defendant stated that he believed he could divert Young, who was tasked with committing the arson, and that he (the agent) permitted the defendant to try to do so. In the event the defendant was unsuccessful and Young was determined to commit the arson, the FBI took steps so it would be in a position to stop the arson from happening that night. Special Agent Zampogna testified that, among other things, his partner provided the defendant with a code so that he could call her, even while in the presence of others, to alert her if the arson was imminent. Special Agent Zampogna testified that at approximately 3:00 a.m. on January 25, 2006, the defendant called the agents, who had been stationed near the Hamden Avenue residence all night, and informed them that Young had gone home and was not going to commit the arson that night.

Special Agent Zampogna testified that on January 26, 2006, he met with the defendant to provide him with a recording device and tasked him with finding out the status of the plan to commit the arson. As the resulting recording makes clear, the defendant met with Maggio in the early afternoon, and they had an extended discussion about why the arson was not committed two nights earlier. Maggio explained why he was targeting one of the residents of the Hamden Avenue house and made it clear he wanted the arson to go forward.

On two occasions later that afternoon, the defendant was alone in his car and talked on the telephone with Special Agent Zampogna. On neither occasion did the defendant tell the agent what he and Maggio had discussed. When the agent later met with the defendant in person - once in the late afternoon to retrieve the first recording device and once in the mid-evening to provide the defendant with a new recording device - the defendant did not tell the agent what he and Maggio had discussed.

In fact, at 9:02 p.m., minutes after the defendant left Special Agent Zampogna and went to meet Young and Maggio, Young said "let's go to my house . . . , pick up the gas cans in my garage [and] go take care of this kid." Over the next six hours, the defendant, Young and Maggio discussed whether they would

commit other crimes that night before settling on committing only the arson.  Shortly before 1:00 a.m. on January 27, 2006, the defendant, Young and Maggio went to Young's house to retrieve a propane bomb and gas canisters.  They then drove to New Jersey to get gas, after which they returned to Staten Island, where they went to a diner for half an hour to have a meal.

Shortly before 3:00 a.m., they split up to commit the arson: the defendant drove Young in the defendant's car, and Maggio drove separately in his car.  A few minutes later, the defendant parked just around the corner from the Hamden Avenue residence and Maggio parked further away.  Young got out of the defendant's car, got the propane bomb and gas canisters from the trunk, ran up to the house and firebombed it.  Young ran back to the defendant's car and confirmed that he had done it as the defendant drove away.  A few blocks away from the scene, they met Maggio.  Young got into Maggio's car and they drove away.  At approximately 3:04 a.m., minutes after the house was lit on fire, the defendant called Special Agent Zampogna and told him "they fucking did the thing with the house."

Special Agent Zampogna testified that, not knowing about the plan in advance, he and his partner were not at the scene as they had been two nights before and that they called 911 and the local police precinct after they received the call from the defendant.  The fire department responded and put out the fire.  A New York City firefighter and paramedic testified that the owner of the house went into cardiac arrest on the backyard lawn.  The man was given CPR and eventually removed from the scene by ambulance.

The defendant, who took the stand in his own behalf, testified incredibly that he in fact told Special Agent Zampogna that the arson was going to happen that night.  Significantly, Special Agent Zampogna's testimony was corroborated by, among other things, the tapes from the day and night of the arson, prior tapes and testimony establishing the agent's response when the defendant raised safety concerns with him in the past, and the defendant's disappearance after the arson.  In stark contrast, the defendant's testimony, like his affirmative defenses of public authority and duress, was utterly without support.

* * * *

Taken together, the evidence of the defendant's sustained participation in criminal activity throughout virtually the entire period in which he was cooperating with the FBI was

12

overwhelming. The defendant testified that he decided to become a confidential informant for the FBI after he was released from prison because he "didn't want to live a bad life anymore." (Trial Tr. 997). The evidence at trial, however, showed that the defendant never gave up his criminal past.

In his sentencing submission, the defendant asserts that, since the arson, his life has changed as he has become a husband and father, and expresses concern for the undoubted hardship his incarceration will cause for his family. (Def. Mem. at 4-5). The defendant also makes a number of assertions that do not square with the procedural history of this case or the evidence at trial. While the government does not respond to each such argument, one aspect of the submission bears particular mention because it goes to the heart of the defendant's failure to accept responsibility and to change his life as he claims to have done. Specifically, the defendant argues that "it is important that the Court remember that the bulk of the crimes Mr. Mergen was convicted of committing occurred several years before his trial began and outside the statute of limitations. The only reason why he [was] charged [was] because he refused to accept a plea of guilty to the January, 2006 arson. Had Mr. Mergen accepted a plea of guilty to the arson charge, then his maximum exposure would have been 5 years with a likelihood of probation." (Def. Mem. at 5).

In fact, in June 2006, the defendant did plead guilty to the interstate travel in aid of racketeering charge based on the arson, pursuant to a cooperation agreement.[5] However, as noted <u>supra</u> and in prior submissions to the Court during the pendency of this case, the government subsequently learned that the defendant withheld material information concerning his past criminal conduct - including a burglary committed three days before the arson - and lied when confronted about it, and thereafter informed counsel that the defendant had breached the cooperation agreement. It was only after that, when negotiations to resolve the breach through a plea to additional charges proved unsuccessful and the government informed the defendant that it would not make a motion pursuant to U.S.S.G. § 5K1.1 on his behalf, that the defendant withdrew his plea of guilty to the interstate travel in aid of racketeering charge. The government

---

[5] It was the tolling provision in the cooperation agreement that permitted the government to charge the defendant with crimes that occurred more than five years prior to the superseding indictment, and thus outside of the applicable statute of limitations. (<u>See</u> Docket Entry No. 46, Order at 5-6 & n.3).

13

was therefore entitled to charge the defendant with the full range of crimes it learned he committed during the period of his cooperation.

In the end, the defendant faces a significant sentence because he committed crimes while he was cooperating with the FBI. It is appropriate, under Section 3553(a), that the defendant's sentence reflect the fact that he assisted the government at the same time that he was continuing to commit extremely serious crimes. The government agrees that a non-Guidelines sentence is more appropriate in this case than is a Guidelines sentence of 30 years, but disagrees that a sentence a day above the statutory minimum of five years is adequate. The government respectfully submits that a sentence substantially in excess of five years is necessary to reflect the seriousness of the defendant's crimes, to achieve general and specific deterrence and to provide for just punishment. See 18 U.S.C. § 3553(a)(2).

## Conclusion

For the reasons set forth above, the government respectfully submits that the defendant Volkan Mergen should be sentenced to a term of imprisonment substantially in excess of the mandatory minimum sentence of five years that he faces.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By: _____
Evan M. Norris
Jack Dennehy
Assistant U.S. Attorneys
(718) 254-6376/6133

cc: Martin Siegel, Esq. (by ECF)
    Michael Dorra, U.S. Probation Department (by email)
    Clerk of Court (NGG) (by ECF)